Can you hear me okay? Yes we can. May it please the court, thank you for having me here. Thank you for taking this case for oral argument. This case arose when a woman named Elaine called the police because there were three black men on the corner where she lived, supposedly in an argument. And she claimed one displayed a gun. Now she also gave a description of two of the men involved. One was the one with the gun was wearing a white t-shirt and black pants. The other was in all blue and had long dreadlocks. Now the communication that was provided to the police officer unfortunately omitted the long dreadlocks on the person wearing all blue. So basically what the dispatch said, three black males that live in the corner house by the alley are arguing outside. One displayed a gun, one with gun, black male, white t-shirt, heavy set, another black male wearing all blue. That's the information that police had when they were dispatched. They didn't know who dispatched it. And you'll see and I hoped to be able to share clips of the video with you but apparently it doesn't work with the system. I can't share my other screen with you under the circumstances so I have to rely that you'll watch these and you'll watch these closely. And I know that you will. But the video is critical because first as Officer Richardson comes down the street where the supposed caller lives, he sees somebody, says you okay, keeps going, meets this woman who he never gets her name out in the street and she says one person, not two people, one person went around the corner wearing white t-shirt and then you can clearly indicate when you see the left camera that she's pointing to her pants and says black and then white or blue but she's clearly saying white shirt, blue or black pants and the officer takes off around the corner. He goes right around the house where the supposed people live. There's a man on that porch. Doesn't do anything about him. He sees a block up the street, two young men that don't fit the description. Arguably if it's just all blue you could say possibly one of the men fit the description but it's clear that she did not report any crime. She did not report that a crime occurred. So in order for there to be a voluntary stop, there's got to be criminal activity afoot. She did not report a crime. She was not a victim. She didn't report a victim. She said black, she said basically and it's unfortunate but she said three magic words. Black, male, gun. She also said disturbance, some kind of a disturbance, right? She said argument and... It's disturbance but tell me it's important. You said the word was argument and not disturbance? What I'm saying is that the dispatch... Okay, in the initial report I thought you said disturbance. And the dispatch that was given to the police, it's only referred to as an argument. I thought the 911 call said disturbance. It did but that 911 call, like the dreadlocks, was not related to the police officer. Oh wait, collective knowledge. I bet you know the collective knowledge, Dr. Counsel. Pardon? I understand but... Counsel, if you'll let me finish a question, we'll do better, especially at this video game, but even in person we do better if you let me finish the question. Okay, my question is simple. The 911 call to the police had the word disturbance, right? Had the word disturbance, correct. But they relayed to the police, you say, what did they relay to the police who were actually picking up? Argument. Argument, thank you. Proceed. Okay, and then again, if you're going to use that collective knowledge, then you've got to retain the person in blue had long dreadlocks. If you're talking about collective knowledge, but I'll let that be. Because then the police officer pulls up and he opens his car door. And this is where the district court, we think, diverted from the actual record on the video. He says two words, stop, stop, something like hold up. His voice is calm, collected, there's nothing, he's not screaming, yelling, or making a command. And then he says, yeah, yeah, you too. At that point, Mr. Bates turns around and says, no, we didn't do anything. We're really not interested in talking to you. And then like a commercial, the officer went from zero to 90 in about 1.8 seconds. Because then he's got his gun out screaming, get on the ground, get on the ground, get on the ground. At that point, you see the other officer pulling up almost simultaneously. And you see just how minimal this escape or interference was. Because they did literally nothing to interfere with any kind of investigation. They didn't go down to the ground fast enough, supposedly. And there's confusion. There's two officers, young, competing things at them. They both get down on their knees. They don't necessarily get on their stomachs maybe as fast as the officer would have liked them. The officer conducts no investigation. He handcuffs him and leaves Derrick Bates on the ground. Or he handcuffs Lorenzo Irving and doesn't handcuff Derrick Bates. Leaves him on the ground, sees a man with a white t-shirt another block or so away, and takes off and goes after him. The court indicated that that was actually beneficial for the analysis of the Terry stop. And we say it's absolutely irrelevant. Because the Terry stop had to be made with the information that he had at the time. It can't be justified by information that he obtained later. So what the court has said is that even though there was no report of a crime, even though if there was a report of a crime, if you take this gun disturbance as a crime, it's a crime already committed. It's done. And the court and Justice Marshall said that, hey, you can't use Terry to look for evidence of a prior crime. The Supreme Court later changed that and said, no, you can if it's a felony. You can conduct a Terry stop looking for evidence of a crime that's already occurred if it's a felony case. The crimes that the district court identified in Iowa are misdemeanors. Okay? So I think the analysis of the Terry stop could stop right there. They were not investigating a felony. They did not have a match. The only person who arguably had committed a crime was wearing a white T-shirt. And you've got two people that match the description who are immediately forced to the ground. And I don't know a reasonable person that would say, get on the ground, handcuff, face first to the pavement, at gunpoint, would indicate that that's a minimal intrusion and not an arrest. Let me interrupt you again. There are two different times in the record here. I don't remember what the district court said if the district court set a time. Is it 11 minutes or 14 minutes that they're faced out on the pavement? And why are those two numbers in there, 11 and 14? Because there's two different people. One person gets let out of the handcuffs earlier than the other. Okay, thank you. Derek Bates is in the handcuffs the longest. Oh, he's in for 14 minutes and Irvin is the 11th. Well, thank you. Thank you for the concise answer. And you can see that from the video as well that Mr. Irvin has let out before. So, A, there's no reasonable Terry. Because Terry, if you're going to say this is a reasonable Terry stop, then you have to be able to say that anybody in the area, doesn't matter what they look like, if there's a gun disturbance involving a black man, we can stop anybody. Because the district court acknowledged that the officer could not see the or determine the race of the person involved when he made the stop. Counselor, I have a question for you. The district court found no constitutional violation here, and it also said even if there was, that the right that you're asserting here was not clearly established. And I think for qualified immunity, well, do you agree that it's arguable, reasonable suspicion that's required here for purposes of qualified immunity? Yes. What are your best cases that suggest, contrary to the district court's conclusion, that this is a clearly established right? So on prong two. I'm sorry? On prong two, what are the best cases? There's clearly the case, and I'll have to come back to the name, but whether they're in the, it's an a certain case where they're in the laundromat, and I said, hey, this is different. You've got somebody that said, I found a gun, these were the only guys, or I found ammunition, they put something in the garbage can, and these are the only two guys there. That's different. But, I mean, isn't it axiomatic that you cannot be arrested without probable cause? I mean, that you are not- Yes. Arguable cause. Arguable probable cause. Yes. Right. And I don't think, and I want to get, and I don't know if I reserve my time, but three minutes, five minutes, four minutes is all I'm allowed to have total. Yes. Okay. Yeah, 347. Total? Yes. Okay. So I want, and I apologize, I'm going to have to rely on the briefs, but I want to get to the actual second arrest because I think that's so critical here. What happens, and you'll see the stop, and you have to say that a reasonable police officer would think that that violated Iowa Code 719.1, Interference with Official Acts. I don't think a reasonable officer would do that. I think this court should look at that. All they do is they take a few steps, they look around confused, and they go to the ground. He didn't interfere with any, he didn't obstruct anything, and key to this is the fact that the officer said, Look, I only arrested him because he didn't go down fast enough. And the second officer said, he told me he arrested him because of the things that he said when he was upset that he was arrested. And to me, that just doesn't rise to even arguable probable cause, and we've cited the cases in our brief that support that. I'd like to reserve the balance of my time. Thank you, Mr. Farrings. Ms. Jacoby. May it please the court, Mr. Farrings. My name is Liz Jacoby. I represent the appellees who are the City of Cedar Rapids, Cedar Rapids Police Chief Wayne German in both his individual and official capacities, and Cedar Rapids Police Officers Jared Juppin and Tyler Richardson. Much like Mr. Farrings, I do want to urge the court to refer back to the videos, as well as documents that are outside those videos, namely the dispatch that would have appeared in the officers' in-car computers, and also... Ms. Jacoby. Yes. Ms. Jacoby, this is Judge Smith. Is your camera on? It should be. It says it is. Okay. Well, we can hear you. We can hear you perfectly, but I was just wondering if perhaps your camera wasn't on as to why we don't have, at least I don't have video of you. I don't know if that's true of my colleagues. Oh. Well, maybe that's just as well. I don't claim to be something to look at. So I would appreciate it, though, if the court would make it a point to look at Joint Appendix 158 and Joint Appendix Page 208, and those will show that what the officers knew was that there was a report of a weapon or firearm and that there was an ongoing argument outside. So I want to emphasize this was not taking place. This is not reported to have been taking place inside. I also ask that the court refer to the Joint Appendix that reflects Officer Richardson's supplement, which is Joint Appendix 258, because that page will reflect that the person on the porch to whom Mr. Fergs referred was not in fact on the porch of the house that these three individuals reportedly resided in. Let me interrupt you since you directed us to those pages. The word red is not on any of those pages. This will be called the red T-shirt case, as sure as I'm sitting here. How can you justify stopping somebody at a red T-shirt when all the words are blue, all blue, blue and black, white, white T-shirt? There are no red here anyplace. Agreed, Your Honor. The individual in red, the officers had a reasonable belief that, or we submit it was reasonable, the officers believed that that person was the third individual for whom the caller provided no particular physical description other than that he was black. Okay, well, isn't that too much of a wild card for even arguable anything? It would be if he hadn't been just around the corner from the point where a bystander reported one person had just gone around the corner. Well, this isn't like the Sykes laundry case where there are just two or three people in this part of town that time of the day. This is a place where they walk by somebody sitting on a porch. We don't know what color T-shirt that person had on either, do we? That's not in the record, is it? Well, it's in the video. Can you see in the video? I couldn't see colors. Can you tell by looking at the video, Counsel? Well, I can tell to some extent. Certainly once the stop has occurred, it's much more readily apparent what Mr. Baker was wearing. Okay, what was the person wearing on the porch that they went around and didn't do anything with? That person you can't tell, but I'd like to speak to that. Yeah, that's what I'm talking about. Counsel, I'm sorry, I was, where? That person met the wild card description of somebody wearing something, and so they didn't do anything about that person. Is that this person? Yes, I'd like to address that. That can't be arguable anything, can it, on a red T-shirt person. So the totality of the circumstances was that one of the persons was in all blue, another person was in a white T-shirt and dark pants and was heavier set. The dreadlocks was never conveyed to the officers, so that's important to remember. So the critical fact here, though, is that as Officer Richardson was proceeding to the area of what he understood to be an ongoing disturbance with the presence of a gun, and I'm going to emphasize here the reasonable possibility of additional weapons being involved. So he is, as he's en route to that particular intersection, he's weighed down just ahead of the intersection by a bicycle. I don't mean to belabor this, but you referred us to these pages, and thank you for doing that. Yes. But it says one displayed a gun. I think the fair inference here, there's only one gun involved. Well, Your Honor, the officers are, and it's not important what they subjectively believe, but as the district court pointed out, it is not unreasonable to go prepared for others to have weapons as well where there is an ongoing argument including at least one gun. And also, it's important that just because the caller reported seeing one weapon, it doesn't mean that it's unreasonable to assume that there were additional weapons. The caller may not have seen either some things that happened prior to the gun being displayed. We don't know whether one of those other two individuals may have engaged in some conduct that prompted the individual in a white shirt to display a gun. But counsel, is it the point that there's no indication that that was the case? So what's the reasonable suspicion based on that? It's certainly possible, but what are the facts that would lead a reasonable officer to that inference? I mean, it's possible. Yes. So the officers were reasonable in inferring that in the context of an argument with one individual displaying a gun, that the others may have also engaged in criminal conduct. But the point of the investigative stop is to inquire about those facts. And as I say, I hate to belabor it, but this was reported to be an ongoing dispute. So there is plenty of people who are... I mean, when the officers approached the plaintiff, there was nothing ongoing at that point. Well, they didn't... I don't know that that's a reasonable conclusion to draw from seeing people who are walking because they may have... First of all, it doesn't require that there be active engagement in a crime right at that moment when the encounter leading to a stop occurs. It can just have occurred, is occurring, or is about to occur, and that's the... Let me ask you a slightly different question. I think our cases suggest that in a Terry stop situation, officers are required to use the least intrusive amount of force possible. What was it that justified the unholstering of the pistols by both of the officers here? And doesn't that suggest that it was something more than a Terry stop? Well, again, referring to the cases cited both by the district court and in our brief, the brandishing of a weapon does not automatically mean that it's more intrusive than a Terry stop. Officers during Terry stops are certainly permitted to do what they need to to protect the public interest or the public safety as well as their own. In this case, not knowing whether anyone had a concealed weapon or perhaps had discarded a weapon. It was necessary that after seeing that they didn't respond to either the first statement of stop, stop, with, yeah, you guys, to confirm that it was them, nor did they stop in response to the second when Officer Richardson is seen pointing his finger at them without a weapon. So by this time, coupled with, again, the totality of the circumstances, the officers had to take, Officer Richardson and Officer Dupin had to take immediate control of the situation because of the potentially gravely dangerous possibilities involved. And it's not unreasonable given also that they were going behind where, behind some foliage such that Richardson would have lost sight of them. So I think it's also important, I want to urge, like Mr. Ferrix did, urge that the court look at the video to see that it's more than a few steps and also I'm going to ask that the court bear in mind that these officers were responding in an emergency fashion and that the events transpired quickly. So... Quickly? Well, when you're face down on the asphalt, 14 minutes is a long time, I bet. Well, I do want to correct that, Your Honor. They were not face down on the asphalt for 14 minutes. They were face down while they were handcuffed and then Officer Dupin, after retrieving his body microphone from the squad car, he assisted Irvin, at least, into a seated position. Irvin's not this appeal counsel. That's a separate appeal, separate panel, I might add. Yes, it is. Yeah, I know. So help me with the simple fact, I thought, tell me again because I was confused on the 11-14 minutes, I thought it was 14 minutes that Richardson, in this case, was face down on the pavement. Mr. Bates was not face down on the pavement for 14 minutes. Okay, well, how long was it? We've got a video. Yeah, I'm sorry. I did not measure the precise amount of time that he was face down, but it was a fraction of the total 14 minutes. It was far less than half. I didn't understand that. Go ahead. Well, and you raise a good point, Your Honor. We can sit here and go through these frame by frame. The officers didn't have that opportunity. They had to make decisions based on the information that they had and reasonable inferences based on their experience and their training. So when we look at the totality of the circumstances and set aside things that we wish they had known or perhaps, you know, even if dispatch should have made sure to include a reference to dreadlocks, the city is not unmindful of the fact that a mistake was made here, but the mistake was a reasonable one under the totality of the circumstances. Counsel, what if we decide, what if we disagree with the district court and find that there were constitutional violations here but nonetheless grant qualified immunity because those were not clearly established? There's a ratification by the city claim here too. Hypothetically speaking, if we were to do that, what happens to that claim? Well, the city should still prevail on the ratification claim because there's no clearly established constitutional violation of which the city had reason to be aware. But if we don't, so it would be at the clearly established problem that you would suggest we dispose of that claim? Well, in terms of ratification, Your Honor, I think speaking directly, more directly than I did initially, if you find that there's qualified immunity, there is no liability for ratification. So the city or Officer German in his individual capacity because his official capacity is the same as the city's role, they have to have had some notice that there was an unconstitutional act that they were approving. Until this court finds that there was a constitutional violation, they're not on notice of a constitutional violation, particularly... Counsel, before your time's gone, I want you to address the interference with official acts. And are you familiar with the small, I think it's small, McCrisco case, which is an Iowa case, that even shouting an obscenity at an officer and walking away from them doesn't give probable cause to arrest under Iowa's interference with official acts. And we've been rejected giving qualified immunity. The district court did not cite that case or get anywhere near that. And so doesn't that surely survive? No, Your Honor, because again, in reviewing the video, you will see that Officer Richardson was reasonable to believe that Mr. Bates had interfered with a lawful command to stop in that... Now wait, walking away, I've got to interrupt, it's time short. The quote from our case is, walking away does not qualify as probable cause to arrest under Iowa's statute. I did it for time. How do you get around that, Counsel? That's as clearly established under this very statute as anything can be. Because he did more than walk away, he was told to stop. So he was walking away from a direct command to stop, which the officer had lawful authority to issue in order to conduct an investigatory... Oh boy, I think the small cases... Anything else you want to say on small? I know you're time's short. Well, I would ask the court to consider also... Pardon me, there are other cases. State of Iowa v. Smithson. State of Iowa v. Sullivan is probably the closest to being on point. And the question here is not whether he could have been convicted, by the way. So if it was insufficient for conviction, that's one thing. But the officer had probable cause and was reasonable in believing he had probable cause to make that stop. I can't tell because I can't see the third digit on the clock, but I suspect my time has expired. You're correct. Your time has expired. Thank you very much. Thank you, counsel. Mr. Frerichs? You need to unmute your mic. I want to reiterate that there's nothing ongoing about these two men simply walking away after buying a soda. There's nothing about that. They don't match the description. And that there's no conduct that they're doing that suggests that there's any kind of an ongoing crime being committed. And if it's not an ongoing crime, then it's got to be a previously convicted or committed felony. And nowhere in this record has anybody suggested that. Counsel, what's the effect of the officer's command to stop and then to continue in the face of repeated commands to stop? I'm glad you brought that up. Because the first, the officer testified, and this was purposely ignored by the court, that his first initial encounter with them was more casual and was more in the lines of a request. And you can hear that in the video. He says, hey, stop, stop, hold up. And yeah, you. And then that's when he gets, no, we're not doing anything, and 0 to 90. And when he goes 0 to 90, not much has gone on at that point. You can see that from Officer Juppin's car. I mean, they're stunned. This guy's screaming at them. And they literally say, really? What did we do? But they don't match the description. There is no crime. Terry's out. The way they took them down was not a Terry stop. I mean, if they would have said stop at gunpoint and frisked them, I mean, then maybe it doesn't turn into an arrest. We don't think there's a Terry. We think it clearly turns into an arrest, and it's clearly an arrest then without probable cause. And there's clearly an arrest without probable cause on interference because they don't even allege that he interfered with any kind of official act. The case law is clear that if I walk away when you say stop, that's not interfering with an official act. I'm not obstructing an investigation. I'm not doing anything of that sort. And I want to close with this because I think, we all know that 1983 was designed to protect people from the government, right? Now we've devolved qualified immunity so that it acts to protect the government from the people. And I think that this case is a prime example of that, and I think a good reason that hopefully that's on its way out. Thank you. Thank you, Mr. Frerichs. Thank you also, Mr. Colby. We appreciate both councils' presence this morning with us in our virtual meeting.